# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNGARETTI & HARRIS, LLP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 09 C 4994 |
| ) | |
| THE SERVICEMASTER COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Before the court are two motions: (1) defendant's motion to dismiss Counts II, III, and IV of the complaint; and (2) plaintiff's motion to dismiss defendant's counterclaim.  For the following reasons, defendant's motion is granted, and plaintiff's motion is granted in part and denied in part.

## BACKGROUND

Ungaretti & Harris, LLP ("Ungaretti"), a law firm, brings this action for outstanding legal fees and "fraudulently obtained rebated legal fees" against a former client, The ServiceMaster Company ("Servicemaster").  From 2005 to 2009, Ungaretti represented Servicemaster and its related companies in more than one hundred lawsuits that primarily involved employment-law issues. According to Ungaretti, "not a single" case it handled "resulted in a verdict adverse to Servicemaster or its subsidiaries and

virtually every case was resolved on terms favorable to Servicemaster." (Compl. ¶ 2.)

The parties had a good business relationship for about a year and a half. In the fall of 2007, however, Servicemaster experienced a management change and budget-cutting directives, and its payments to Ungaretti "began to falter." (Id. ¶¶ 16-17.) Servicemaster stopped paying Ungaretti's bills in full and began to negotiate reduced bills and credits, claiming that certain charges were excessive "without any review of the actual task or the complexities of the work." (Id. ¶ 20.) Ungaretti alleges that it nonetheless continued to "faithfully and fully" provide legal services to Servicemaster. (Id. ¶ 19.)

In 2007 Servicemaster also instituted a "preferred counsel" program, also known as a "primary firm network," pursuant to which a limited number of law firms would be eligible to be engaged to provide legal services. Plaintiff explains that these programs "are used by many large companies like Servicemaster to be more efficient with outside counsel dollars by limiting the number of firms eligible for their work and demanding steep discounts or credits from those firms in consideration for being chosen to be in the network." (Id. ¶ 3.) Servicemaster chose Ungaretti as one of its preferred law firms.

In response to "explicit guarantees" from individuals in Servicemaster's legal department that Servicemaster would continue

to refer legal matters to Ungaretti (which Ungaretti alleges were false promises) and in response to Servicemaster's repeated requests for rebates, Ungaretti provided rebates and credits to Servicemaster totaling $128,015.38. (Id. ¶ 4.) Despite its acceptance of the rebates, Servicemaster thereafter terminated its relationship with Ungaretti and failed to engage Ungaretti in any additional matters. Servicemaster also refused to pay $284,259.47 in outstanding legal fees that were incurred, for the most part, in the defense of two matters described in the complaint.

Ungaretti has filed a four-count complaint for breach of contract and of the covenant of good faith and fair dealing (Count I); quantum meruit (Count II); common-law fraud (Count III); and unjust enrichment (Count IV). It seeks to recover $284,259.47 in outstanding fees and $128,015.38 in rebates that were allegedly fraudulently obtained, plus interest, punitive damages, costs, and reasonable attorney's fees.

Servicemaster has filed a two-count counterclaim. In Count I, Servicemaster alleges that Ungaretti breached its contract with Servicemaster, specifically Ungaretti's guarantee of client satisfaction, by refusing to reduce its bills. Count II is a claim that Ungaretti breached its fiduciary duty to Servicemaster by disclosing, in the complaint in this lawsuit, confidential information relating to its representation of Servicemaster that is not necessary to recovering its fees.

Servicemaster moves to dismiss Counts II, III, and IV of the complaint. Ungaretti moves to dismiss the counterclaim.

## DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). Under federal notice-pleading standards, a complaint need not contain "detailed factual allegations," but it must have more than mere "labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff is obligated to provide the factual grounds of his entitlement to relief, and a "formulaic recitation" of the elements of a claim will not do. Id. The complaint must contain sufficient facts to raise a plaintiff's right to relief above a "speculative" level, id. at 555, and the claim must be "plausible on its face," id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint, but not its legal conclusions. Id. at 1949-50.

**A.   Servicemaster's Motion to Dismiss Counts II, III, and IV**

    **1.   Quantum Meruit and
       Unjust Enrichment (Counts II and IV)**

Servicemaster contends that Ungaretti's quasi-contractual claims should be dismissed because the relationship between the parties was governed by an express contract, citing, <u>inter alia</u>, our opinion in <u>Song v. PIL, L.L.C.</u>, 640 F. Supp. 2d 1011 (N.D. Ill. 2009). Ungaretti responds that the claims are proper alternative theories of recovery.

"An express contract is a contract in which the terms of the contract or agreement are openly and fully uttered and avowed at the time of the making." <u>Impo Glazetile, Inc. v. Florida Tile Indus., Inc.</u>, No. 92 C 6930, 1994 WL 630550, at *4 (N.D. Ill. Nov. 8, 1994) (internal quotation marks omitted). Our decision in <u>Song</u> was based on the principle that a plaintiff may not bring quasi-contract claims where there is an express contract governing the parties' relationship. Song had alleged, and the defendants did not dispute, the existence of an express contract. The instant case is distinguishable from <u>Song</u> because Ungaretti has not alleged that the agreement between the parties was an express contract, and indeed, it appears that the parties do not agree on the terms of their agreement. Therefore, plaintiff will be permitted to proceed on its quasi-contractual claims. However, it has not properly

alleged those claims in the alternative because Counts II and IV incorporate by reference its contradictory prior allegation of an agreement between the parties. Therefore, Counts II and IV will be dismissed without prejudice, and Ungaretti will be given leave to file an amended complaint that does not incorporate the contradictory allegation in those claims.

### 2. **Common-Law Fraud (Count III)**

In Count III, Ungaretti alleges that Servicemaster "made several misleading material omissions and/or false statements of material fact regarding the $100,000 Rebate given by [Ungaretti] on its outstanding bills for legal fees." (Compl. ¶ 76.) It is further alleged:

> 77. For months in late 2007 and early 2008, Servicemaster requested a rebate in the amount of $100,000 for amounts owed to [Ungaretti] for legal services previously performed.
>
> 78. On multiple occasions, [Ungaretti] expressly conditioned any rebate . . . on Servicemaster sending future legal work to [Ungaretti].
>
> 79. On several occasions in late 2007 and early 2008, Servicemaster acknowledged its understanding and acceptance of [Ungaretti's] condition for giving the Rebate, including but not limited to an in-person meeting in Syracuse, New York with representatives of [Ungaretti] in April 2008.
>
> 80. At the time that Servicemaster made these statements that it would send future legal work to [Ungaretti], it knew or should have known that the statements were false.
>
> 81. At the time that Servicemaster made these statements, its intent was to induce [Ungaretti] to rebate its outstanding bills by $100,000.

> 82. [Ungaretti] relied upon the purported truth of Servicemaster's statements regarding the Rebate and, as a result of this reliance, reduced the amount of its outstanding bills owed by Servicemaster by $100,000.
>
> 83. [Ungaretti] relied upon the purported truth of Servicemaster's statements regarding the Rebate and, as a result of this reliance, reduced the amount of another outstanding bill owed by Servicemaster by $28,015.38 . . . . .
>
> 84. As a result of [its] reliance upon Servicemaster's false statements of material fact regarding the Rebate, [Ungaretti] has suffered damages in excess of $128,015.38.

(Id. ¶¶ 77-84.)

Servicemaster seeks dismissal of Count III on three grounds. The first is that the claim is not pled with sufficient particularity. Because plaintiff alleges fraud, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply. Rule 9(b) requires a plaintiff to plead with particularity the factual bases for averments of fraud, including "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (stating that the plaintiff must plead the who, what, when, where, and how of the alleged fraud). Servicemaster's second argument for dismissal of the fraud claim is that Ungaretti's claim amounts to promissory fraud, which is not actionable unless the alleged

misrepresentations were part of a scheme to defraud, and a scheme is not alleged. Ungaretti responds that it has adequately alleged such a scheme in that the "primary firm network was the scheme" and the "false promises of future work were the scheme" by which it was defrauded by Servicemaster. (Pl.'s Opp'n at 9.)

Defendant correctly states that promissory fraud, which involves false statements of intent regarding future conduct, is not actionable under Illinois law unless the plaintiff alleges that the statements were part of a scheme to defraud. Association Benefit Servs., Inc. v. Caremark Rx, Inc., 493 F.3d 841, 853 (7th Cir. 2007). "The scheme exception applies where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." Bower v. Jones, 978 F.2d 1004, 1011 (7th Cir. 1992) (internal quotation marks omitted). On the distinction between a mere promissory fraud and a scheme of promissory fraud, the Seventh Circuit has observed:

> The distinction certainly is unsatisfactory, but it reflects an understandable ambivalence, albeit one shared by few other states, about allowing suits to be based on nothing more than an allegation of a fraudulent promise. There is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation that the doctrine of consideration is supposed however ineptly to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract. A great many promises belong to the realm of puffery, bragging, "mere words," and casual bonhomie, rather than to that of serious commitment. They are not intended to and ordinarily do not induce reliance; a healthy skepticism is a better

>protection against being fooled by them than the costly remedies of the law. In any event it is not our proper role as a federal court in a diversity suit to read "scheme" out of Illinois law; we must give it some meaning. Our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.

Desnick v. American Broad. Cos., 44 F.3d 1345, 1354 (7th Cir. 1995).

Although Count III alleges that Servicemaster made "several misleading material omissions and/or false statements of material fact," ¶ 76, none are alleged with sufficient particularity. The closest plaintiff comes is paragraph 51, which states: "During an in-person conversation in Syracuse, New York in April 2008, [Timothy] Harrison[1] confirmed his understanding on behalf of Servicemaster that it would send future legal work assignments to [Ungaretti] in return for the $100,000 rebate Servicemaster requested." We do not agree with Servicemaster's contention that plaintiff must specify "the type of work at issue" or when the work would be assigned; the content of the alleged promise is adequately presented. But we do agree that plaintiff must specify the identity of the person to whom the misrepresentation was communicated. See, e.g., Sears v. Likens, 912 F.2d 889, 893 (7th

---

[1]/ According to paragraph 46 of the complaint, Harrison is "Senior Counsel" for Servicemaster.


Cir. 1990). Clearly, this information is available to the plaintiff.

Plaintiff argues that with regard to the $28,015.38 rebate, it has sufficiently alleged fraud with particularity by virtue of the allegation that Harrison "threatened to remove" Ungaretti from a particular matter unless Ungaretti "consented to the requested rebate." (Pl.'s Opp'n at 9-10 (citing Compl. ¶ 59).) But plaintiff fails to explain how this threat constituted any sort of misrepresentation.

Moreover, Ungaretti has not alleged that Servicemaster engaged in a scheme to defraud. To satisfy the "scheme" requirement, plaintiff must plead a pattern of deceptions. Desnick, 44 F.3d at 1354. Ungaretti has failed to plead even one fraudulent act with specificity, much less a larger pattern of deceptions. Contrary to the argument in its brief, Ungaretti does not allege in the complaint that Servicemaster's "preferred counsel" program was a scheme to defraud (or explain how the program constituted a pattern of deceptions), nor is a pattern of false promises of future work alleged.

Servicemaster's third argument for dismissing Count III is that any reliance by Ungaretti on a letter of January 24, 2008 from Servicemaster, quoted in part in paragraph 49 of the complaint, was unreasonable. Paragraph 49 states:

> Harrison made affirmative representations that he and
> Servicemaster understood and accepted [Ungaretti's

> condition that Servicemaster agree that Ungaretti would receive future work assignments] in return for the rebate Servicemaster was seeking. In a letter sent on January 24, 2008, representatives from Servicemaster wrote:
>> The Servicemaster legal department is also in the process of implementing a Preferred Counsel Program. Some of the selection criteria for the Preferred Counsel Program include agreeing to abide by the Guidelines and offering Servicemaster a reasonable discount on your base billing rates. . . . If you are interested in participating in the program, please respond by February 6, 2008 . . . . with the type[] of matters that you would propose handling for Servicemaster, your current billing rates, any existing discount you[] provide us, whether any further discount will be available to us (including based on any volume threshold), the name of any e-billing vendors you currently use, and any other information you want to submit for consideration.

(Compl. ¶ 49.) A copy of the letter is attached as Exhibit 2 to the complaint. Ungaretti asserts that the letter is "evidence of Servicemaster's scheme to defraud" it. (Pl.'s Opp'n at 12.) We disagree. The letter cannot reasonably be construed to be any sort of representation that Ungaretti would receive future work from Servicemaster, or even a representation that Ungaretti would be chosen to participate in the preferred counsel program. The letter is simply an invitation to submit an application, so to speak, for Servicemaster's consideration.

Because plaintiff has failed to adequately plead its fraud claim, Count III will be dismissed. Conceivably, plaintiff will be able to state a fraud claim, so the dismissal will be without prejudice.

**B.     Ungaretti's Motion to Dismiss the Counterclaim**

   **1.     Breach of Contract (Count I)**

In Count I of its counterclaim, Servicemaster alleges that Ungaretti breached the "written guarantee of client satisfaction" that appears on Ungaretti's web site. The guarantee states:

> WE **GUARANTEE** THAT AS A CLIENT OF UNGARETTI & HARRIS YOU WILL RECEIVE **COST-EFFECTIVE** LEGAL SERVICES DELIVERED IN A **TIMELY** MANNER. WE PROMISE TO **INVOLVE** YOU IN STRATEGIC DECISIONS AND TO **COMMUNICATE** WITH YOU REGULARLY. WE CANNOT GUARANTEE OUTCOMES, BUT WE DO **GUARANTEE YOUR SATISFACTION** WITH OUR **SERVICE**. IF AT ANY TIME UNGARETTI & HARRIS DOES NOT PERFORM TO YOUR SATISFACTION, WE ASK THAT YOU INFORM US **PROMPTLY**. WE WILL THEN RESOLVE THE ISSUE TO **YOUR SATISFACTION**, EVEN IF IT MEANS REDUCING OUR LEGAL FEES.

(Countercl., Ex. A.) Servicemaster alleges that it was not satisfied with Ungaretti's services in connection with the two matters discussed in Ungaretti's complaint, that it advised Ungaretti of its dissatisfaction in that the legal fees charged in connection with those matters were two to three times the budgeted amounts, and that Ungaretti refused to reduce its bills. (Countercl. ¶¶ 34-35.) According to Servicemaster, Ungaretti's refusal to reduce its legal bills in the amount requested by Servicemaster was a breach of Ungaretti's guarantee of client satisfaction and therefore a breach of contract. Ungaretti argues that Count I should be dismissed because the guarantee was a

"marketing tool" and too vague to constitute an enforceable contract.

We cannot accept Ungaretti's argument that the guarantee was a mere "marketing tool." It is true that there are many terms in the guarantee that are too vague to be enforceable, such "cost-effective," "timely," and "strategic decisions." But the guarantee clearly promises that if Ungaretti does not perform to a client's satisfaction, Ungaretti will resolve the issue to the client's satisfaction, even if it means reducing legal fees. This is an enforceable promise. Of course, the law would interpret this provision of the guarantee to contemplate reasonable and actual dissatisfaction; the law always implies reasonableness when interpreting contracts. With that limitation, we see nothing vague about the guarantee of satisfaction. Accordingly, Ungaretti's motion to dismiss Count I will be denied.

### 2. **Breach of Fiduciary Duty (Count II)**

Servicemaster alleges in Count II that Ungaretti has an ongoing fiduciary duty to maintain the confidences of Servicemaster, its former client, and that Ungaretti breached this duty by disclosing, in the instant complaint, confidential information regarding Servicemaster's litigation policies and strategies.

Ungaretti contends that Servicemaster fails to state a claim because it has not adequately alleged that it was harmed by the

breach. The counterclaim states: "Servicemaster has been damaged by [Ungaretti's] breach of fiduciary duty. Among other things, Servicemaster believes that it has been prejudiced as a consequence of [Ungaretti's] disclosure of Servicemaster's litigation policies, strategies and internal communications." (Countercl. ¶ 45.) Servicemaster responds that it need not allege more.

Pursuant to Iqbal, Servicemaster must allege facts from which we can draw the reasonable inference that it was harmed. 129 S. Ct. at 1949 (stating that federal pleading standards demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). The vague allegation that Servicemaster "believes that it has been prejudiced" is insufficient, and there are no facts alleged from which we could infer that it suffered damage as a result of the alleged breach.

There is another reason (not raised by Ungaretti) why Count II fails to state a claim: absolute privilege. The doctrine of absolute privilege provides complete immunity from civil liability for statements made in judicial proceedings, even if the statements are made with malice, because public policy favors the free flow of information in conjunction with those proceedings. Jurgensen v. Haslinger, 692 N.E.2d 347, 349-50 (Ill. App. Ct. 1998). The privilege covers formal pleadings. Barakat v. Matz, 648 N.E.2d 1033, 1039 (Ill. App. Ct. 1995). Usually the doctrine arises in the context of defamation actions, but it has broader application.

See, e.g., Jurgensen, 692 N.E.2d at 349-50 (holding that absolute privilege applied to a claim for tortious interference with an expectancy under a will); McNall v. Frus, 784 N.E.2d 238, 240 (Ill. App. Ct. 2002) (holding that absolute privilege applied to a negligence claim). Because Count II is based on the statements made by Ungaretti in its pleading, the doctrine of absolute privilege is applicable.

## **CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss Counts II, III, and IV of the complaint [17] is granted. Counts II, III, and IV of the complaint are dismissed without prejudice, and plaintiff is given leave to file an amended complaint by June 11, 2010.

Plaintiff's motion to dismiss defendant's counterclaim [21] is granted as to Count II, which is dismissed with prejudice, and denied as to Count I.

The stay of discovery currently in place is hereby lifted. Discovery is to proceed forthwith.

DATE: May 27, 2010

ENTER: _____

John F. Grady, United States District Judge